IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **GILEAD SCIENCES, INC.,** *et al.*,<br><br>**Plaintiffs**<br><br>v.<br><br>**MERITAIN HEALTH, INC.,** *et al.*,<br><br>**Defendants.** | Case No. 1:24-cv-03566-JRR |

### MEMORANDUM OPINION

This matter comes before the court on Defendant Gregory Santulli's Motion to Dismiss for Lack of Personal Jurisdiction. (ECF No. 106; the "Motion.") The court has reviewed all papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons set forth below, Defendant Santulli's Motion is denied.

I.      **RELEVANT BACKGROUND**

Plaintiffs initiated this gray market Lanham Act and Maryland state law action against Defendants Meritain Health, Inc. ("Meritain Health"), ProAct Inc. ("ProAct"), Rx Valet, LLC ("Rx Valet"), Advanced Pharmacy, LLC ("Advanced Pharmacy"), Aqua Enterprise Inc. d/b/a Affordable Rx Meds ("Affordable Rx"), Gregory Santulli,[1] and Fetih Eczanesi (collectively, "Defendants") targeting Defendants' alleged scheme (and related practices)[2] of illegally importing and filling U.S. patient prescriptions for Plaintiffs' proprietary BIKTARVY® medication with the (authentic) Turkish (not U.S.) version of that drug.

In the Complaint, Plaintiffs describe the experience of a U.S. BIKTARVY® patient, John

---

[1] Throughout this action, Rx Valet, Advanced Pharmacy, Affordable Rx, and Santulli, have referred to themselves as "the Quartet," which the court has adopted for clarity and efficiency.
[2] This opinion does not describe the allegations pertaining to Defendants Meritain Health, ProAct or Eczanesi.

Doe, who allegedly received Turkish BIKTARVY® instead of U.S. BIKTARVY® as a result of Defendants' unlawful scheme to fill prescriptions for the U.S. version of the drug with its international counterparts; here Turkish BIKTARVY®. Confused by the medication he received (contained in a bottle bearing labels in the Turkish language) after having his prescription filled by and through the combined services of Rx Valet and Advanced Pharmacy, Mr. Doe contacted Plaintiffs to report the incident and his related concern and confusion. Following that, Plaintiffs undertook to investigate what happened, which ultimately led to this action.

Plaintiffs bring six claims: Federal Trademark Infringement, 15 U.S.C. § 1114(1), against all Defendants (Count I); Federal Unfair Competition, 15 U.S.C. § 1125(a), against all Defendants (Count II); Unfair Competition Under State Law against all Defendants (Count III);[3] Unjust Enrichment against Defendants Eczanesi and the Quartet (Count IV); Importation of Good Bearing Infringing Marks, 15 U.S.C § 1124, against all Defendants (Count V); and Civil Conspiracy against all Defendants (Count VI). (Complaint, ECF No. 1.)

Plaintiffs assert the court has personal jurisdiction over Defendants as follows:

> This Court has personal jurisdiction over Defendants pursuant to Maryland's Long Arm Statute, Md. Code Ann., Cts. & Jud. Proc. § 6-103, and consistent with the due process clause of the Fourteenth Amendment of the U.S. Constitution because: Defendants (i) transact business in Maryland; (ii) contract to supply goods, food, services, or manufactured products in Maryland; (iii) caused tortious injury in Maryland by an act or omission in Maryland; and (iv) caused tortious injury in Maryland by an act or omission outside of Maryland, and regularly do or solicit business, engage in other persistent course of conduct in Maryland, or derive substantial revenue from goods, food, services, or manufactured products used or consumed in Maryland. Defendants' conduct alleged herein was knowingly and intentionally directed toward Maryland, and Defendants purposefully availed themselves of Maryland's market and laws. The effects of Defendants' conduct in Maryland were not only foreseeable; they were foreseen and intended.

(Complaint, ECF No. 1 ¶ 19.)

---

[3] No party has challenged that Maryland State law applies to the state law-based tort claims.

As to Mr. Santulli, Plaintiffs' allegations include that he is the "founder and CEO of Rx Valet and . . . the President of Advanced Pharmacy." *Id.* ¶ 16; *see also id.* ¶ 67. The Complaint describes the following regarding the alleged concerted intentional actions of Rx Valet, Advanced Pharmacy, and Mr. Santulli:

> 36. Rx Valet instructed John Doe to have his doctor send his BIKTARVY® prescription to Advanced Pharmacy, a mail-order pharmacy based in Georgia. Rx Valet advertises Advanced Pharmacy as Rx Valet's pharmacy, and Gregory Santulli, the founder and CEO of Rx Valet, is also the President of Advanced Pharmacy. Advanced Pharmacy has a very minimal online presence, and exists for the purpose of selling and facilitating the sale of infringing and illegally imported medications.
>
> . . .
>
> 61. Defendant Rx Valet is an "Alternative Funding Program" based in Georgia, which purports to provide services to health plans and [pharmacy benefit managers – "PBMs"] that will reduce the cost of providing prescription-drugs benefits to their insured patients.
>
> 62. Rx Valet advertises that it provides health plans "International Sourcing" of prescription drugs, which it also refers to as "International Pharmacy." Rx Valet advertises that it "utilize[s] a network of affiliated pharmacies from around the world" to provide "the lowest pricing for name-brand medications." It asserts that the medicines are "the exact same quality as if they were dispensed in the U.S." and that international importation is a "safe, convenient way to save big on the Rx Valet medications you know and trust."
>
> 63. Rx Valet coordinated directly with John Doe and told him that, to obtain BIKTARVY® through his insurance prescription benefit for a $0 copay, he would have to direct his doctor to send his prescription to Advanced Pharmacy. Rx Valet gave this instruction knowing and intending that the prescription would be filled by an international pharmacy supplying international medication, not by a U.S. pharmacy supplying U.S. medication.
>
> 64. Rx Valet's web site openly advertises that it will sell or source the following international Gilead-branded medicines: AMBISOME®, BIKTARVY®, DESCOVY®, GENVOYA®, SOVALDI®, STRIBILD®, TRUVADA®, and VOSEVI®.
>
> 65. Rx Valet has regularly worked and continues to regularly work with American patients, U.S. health plans, and PBMs to fill patients' prescriptions with infringing, non-FDA approved international Gilead-branded medicines. Rx Valet

3

reaps enormous illicit financial awards for its infringement. Rx Valet's infringement is intentional, knowing, and willful.

66. Defendant Advanced Pharmacy is a mail-order pharmacy based in Georgia.

67. Advanced Pharmacy's President, Defendant Gregory Santulli, is also the CEO and founder of Rx Valet.

68. Advanced Pharmacy advertises itself as Rx Valet's "mail order home delivery pharmacy." Advanced Pharmacy's information appears on the "contact us" page of Rx Valet's website, rxvalet.com.

69. Advanced Pharmacy is not a legitimate pharmacy. It exists only to sell and arrange for the sale of unlawful and infringing imported foreign drugs and medical devices.

70. After it received John Doe's BIKTARVY® prescription, Advanced Pharmacy did not dispense U.S. BIKTARVY® to him, even though U.S. BIKTARVY® was and is readily available. Instead, Advanced Pharmacy provided the BIKTARVY® prescription to Affordable Rx Meds, with the understanding and intention that Affordable Rx Meds would refer the prescription to one of its foreign "contracted pharmacies," which would unlawfully provide international BIKTARVY® instead of U.S. BIKTARVY®.

71. Advanced Pharmacy regularly accepts prescriptions for Gilead-branded medicines – most or all of which of which are referred by Rx Valet – and arranges for those prescriptions to be unlawfully filled with international Gilead medicines from foreign pharmacies.

72. Advanced Pharmacy advertises that it will sell or source the following international Gilead-branded medicines: AMBISOME®, BIKTARVY®, DESCOVY®, GENVOYA®, SOVALDI®, STRIBILD®, TRUVADA®, and VOSEVI®.

73. Advanced Pharmacy's infringement of Gilead's trademark rights is intentional, knowing, and willful. Advanced Pharmacy reaps enormous illicit profits for its infringement.

74. Gregory Santulli is the founder, owner, and CEO of Rx Valet, and is also a member and President of Advanced Pharmacy.

75. As the founder and CEO of Rx Valet and the President of Advanced Pharmacy, Santulli is intimately involved in Rx Valet and Advanced Pharmacy's efforts to import international prescription drugs. Santulli directs, approves, and supervises both companies' advertising, sales, and importation of infringing

4

international Gilead-branded medicines. He controls both companies and is an active and moving force behind both companies' infringement. Santulli directly financially benefits from his companies' infringement.

. . .

77. Santulli intentionally, knowingly, and willfully violated Gilead's trademarks.

(Complaint, ECF No. 1 ¶¶ 36, 61–75, 77.)

Defendant Santulli moves to dismiss the Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). Specifically, Mr. Santulli argues the Complaint fails to assert an adequate basis to assert personal jurisdiction over him under Maryland's long-arm statute (as required, but which failure may be cured in opposition to a 12(b)(2) motion),[4] fails to allege adequate jurisdictional facts specific to him, and that the court lacks general and specific personal jurisdiction over him.

Mr. Santulli offers his affidavit in support of his Motion. (ECF No. 106-2.) He attests that he owns no real property in Maryland, pays no taxes in Maryland, and has not stepped foot in the State in the "last five years." Mr. Santulli further attests he is the founder and CEO of Rx Valet, a Georgia LLC with no Maryland offices, and that he is one of its three members; he is also the President and sole member of Advanced Pharmacy, a South Carolina LLC with no Maryland offices. By his affidavit, Mr. Santulli declares further that he does not "personally control the day-to-day business operations of either Rx Valet or Advanced Pharmacy:"

> My responsibilities of running these two companies are in my capacity as CEO of Rx Valet and President of Advanced Pharmacy . . . . I do not answer customer service telephone calls or emails. I do not contact customers . . . . I do not place orders or follow up with customers regarding prescription orders. I do not personally supervise the day-to-day activities of the employees who conduct these operations.

---

[4] Specifically, Santulli at once asserts Plaintiffs fail to "identify the section of the long-arm statute on which they rely" and that Plaintiffs' "jurisdictional allegations as to the long-arm statute are boilerplate and asserted generally as against all defendants collectively." (Motion at p. 7.)

(ECF No. 106-2 ¶¶ 20–21.) Mr. Santulli further attests to the observance of corporate formalities in both entities, including the absence of co-mingling of personal and entity financial accounts; and that "[n]either Rx Valet nor Advanced Pharmacy targets any advertising to the State of Maryland specifically. . . . Neither Rx Valet nor Advanced Pharmacy regularly conducts business in the State of Maryland." *Id.* ¶¶ 20, 22.

Defendant Santulli's Motion urges that the court lacks personal jurisdiction over him generally and specifically due to his lack of personal contacts with, and actions directed at, Maryland, and because "he never personally contacted or had any communications whatsoever with John Doe" and "was not personally involved in processing the transaction that resulted in shipment to John Doe of a prescription for Gilead brand BIKTARVY®." (Motion, ECF No. 106-1 at pp. 4–5.) In his Motion, Defendant Santulli takes the position that Plaintiffs' allegations are insufficient, even accepted as true, to give rise to his vicarious liability for the acts of Rx Valet and/or Advanced Pharmacy; the Complaint does not allege he is the alter ego of either business entity, and the Complaint fails to allege facts to allow for liability by way of piercing the corporate veil. *Id.* at pp. 9–10.

Plaintiffs counter that Defendant Santulli misapprehends the law applicable to this action. Specifically, Plaintiffs argue that Defendant Santulli's alleged role as the "origin of and active force behind" Rx Valet and Advanced Pharmacy's illegal scheme to import foreign Gilead-branded drugs into Maryland – which is the heart and soul of this trademark action – is more than sufficient to hold him liable under the Lanham Act. (Opposition, ECF No. 141, at p.1.) The arms of the Lanham Act, as a matter of law, Plaintiffs explain, reach Defendant Santulli directly by virtue of his own alleged actions (his control and direction of, and benefit from, the relevant acts of Rx Valet and Advanced Pharmacy); Plaintiffs are not tasked with the challenge of piercing the

6

corporate form to hold him legally responsible. Therefore, Plaintiffs contend, Defendant Santulli's assertions that he had no direct, personal contact with Maryland (or Doe) and that he observes corporate formalities, are effectively of no moment as a matter of law. *Id.* at pp. 19–21 (citing cases regarding direct liability of corporate officers for trademark infringement on the basis of direction of, control of, and participation in the infringing activity).

In support of their opposition, and in supplement to their Complaint allegations, Plaintiffs furnish the court with exhibits consisting of discovery materials obtained as a result of the expedited discovery this court ordered for purposes of the pending motion for preliminary injunction. (Alternatively, Plaintiffs seek jurisdictional discovery.) In addition, Plaintiffs argue that Defendant Santulli waived his Rule 12(b)(2) personal jurisdiction challenge by virtue of his participation in this litigation.

In his Reply (ECF No. 178), Defendant Santulli strikes at Plaintiffs' apparent abandonment in their Opposition that the court has general personal jurisdiction over him. *Id*. at p. 1  He does not, however, endeavor to answer Plaintiffs' targeted argument that an individual defendant may be liable under the Lanham Act for the acts of an entity he directs and controls in the manner they contend Mr. Santulli has. Defendant Santulli does spend considerable energies disputing that the exhibits Plaintiffs append to their Opposition have the jurisdictional import Plaintiffs assert. Defendant Santulli also vociferously defends against Plaintiffs' waiver argument.

For the reasons that follow, the court denies the Motion based on the allegations set forth in the Complaint. The court need not consider, and has not considered, the expedited discovery exhibits appended to Plaintiffs' Opposition; jurisdictional discovery is not warranted; and, because the court finds it has personal jurisdiction over Defendant Santulli based on Plaintiffs' Complaint, the court declines to reach the question of whether Defendant Santulli waived his personal

jurisdiction challenge.

## II.  LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(2)

"A motion to dismiss under Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction challenges a court's authority to exercise its jurisdiction over the moving party." *Arkansas Nursing Home Acquisition, LLC v. CFG Cmty. Bank*, 460 F. Supp. 3d 621, 635–36 (D. Md. 2020) (citing *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)). "The jurisdictional question is 'one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence.'" *Id.* (quoting *Combs*, 886 F.2d at 676).

"The plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[W]hen the court addresses the personal jurisdiction question by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Id.* at 268. Importantly, "[i]n deciding whether the plaintiff has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

"The requirement that the court have personal jurisdiction . . . springs not from Article III of the Constitution, but from the Due Process Clause." *Fidrych v. Marriott Int'l, Inc.,* 952 F.3d 124, 131 (4th Cir. 2019) (citing *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)). "Because the personal jurisdiction requirement 'recognizes and protects

an individual liberty interest, . . . the requirement may be waived by a defendant's 'express or implied consent to the personal jurisdiction of the court.'" *Id.* (citing *Ins. Corp. of Ireland*, 456 U.S. at 703.) "Absent consent, the exercise of personal jurisdiction must comport with the requirements of the Due Process Clause: valid service of process, as well as . . . minimum contacts with the forum so that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Id.* (quoting *Hawkins v. i-TV Digitális Távközlési zrt.*, 935 F.3d 211, 228 (4th Cir. 2019)) (citations omitted). The nature and quantity of forum-state contacts required depends on whether the case involves the exercise of "specific" or "general" jurisdiction. *Id.*

A court may assert general jurisdiction over a foreign defendant to hear any and all claims against him when his affiliations with the State are "so 'continuous and systematic' as to render [him] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A., v. Brown*, 564 U.S. 915, 919 (2011) (citing *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 317 (1945)). Specific jurisdiction depends on an "'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (quoting von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV. 1121, 1136 (1966)).

### III.  ANALYSIS

#### A. Maryland Long-Arm Statute

Under Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law. *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).

In order for the court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's

long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment. *Christian Sci. Bd. of Dirs. of the First Church of Christ v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). This court accepts as binding Maryland courts' interpretation with regard to the state's long-arm statute. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 61 (4th Cir. 1993). It is well settled in Maryland that the state's long-arm statute is coextensive with the limits of personal jurisdiction set by the due process clause of the United States Constitution. *Mohamed v. Michael*, 279 Md. 653, 657–58 (1977). Thus, this court's statutory and constitutional inquiry is merged for purposes of establishing personal jurisdiction. *Stover v. O'Connell Assocs., Inc.*, 84 F.3d 132, 135 (4th Cir. 1996).

Maryland's long-arm statute provides:

**(a)** If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

**(b)** A court may exercise personal jurisdiction over a person, who directly or by an agent:

> **(1)** Transacts any business or performs any character of work or service in the State;
>
> **(2)** Contracts to supply goods, food, services, or manufactured products in the State;
>
> **(3)** Causes tortious injury in the State by an act or omission in the State;
>
> **(4)** Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State;
>
> **(5)** Has an interest in, uses, or possesses real property in the State; or
>
> **(6)** Contracts to insure or act as surety for, or on, any person, property, risk, contract, obligation, or agreement located, executed,

>or to be performed within the State at the time the contract is made, unless the parties otherwise provide in writing.

MD. CODE ANN., CTS. & JUD. PROC. §§ 6-103(a) and (b).

Maryland's long-arm statute requires Plaintiffs to identify the section of the long-arm statute on which they rely. *Id.* § 6-103(a); *see Ottenheimer Publishers, Inc. v. Playmore, Inc.*, 158 F. Supp. 2d 649, 652 (D. Md. 2001) (explaining that "[i]t is nonetheless necessary first to identify a specific Maryland statutory provision authorizing jurisdiction . . . ."). This requirement can be met through a complaint or in opposition to a Rule 12(b)(2) motion. *Hausfeld v. Love Funding Corp.*, 16 F. Supp. 3d 591, 597 (D. Md. 2014).

Here, as set forth above, in their Complaint, Plaintiffs rely on § 6-103 generally as the basis for personal jurisdiction over all Defendants. In their Opposition, Plaintiffs point to §§ 6-103(b)(1), (3), and (4) as to Defendant Santulli. Plaintiffs' Complaint alleges that Defendant Santulli directed tortious activity inside the State – based on his direction and control of the scheme to advertise, and contract to provide and deliver, infringing international Gilead-branded BIKTARVY® into the State, and specifically to patient John Doe who received the infringing product. Importantly, with respect to § 6-103(b)(3), the "tortious wrong of trademark infringement takes place in either the place where the infringer commits acts of infringement or in the place where customers are likely to be deceived and confused." *Planet Techs., Inc. v. Planit Tech. Grp., LLC*, 735 F. Supp. 2d 397, 404 (D. Md. 2010). Therefore, a court may assert personal jurisdiction in a Lanham Act case in the state where the deception and confusion took hold (here, in Maryland) notwithstanding that the alleged bad actor remained physically outside state lines while undertaking the infringement.

### B. Due Process Clause of the Fourteenth Amendment

Personal jurisdiction over a non-resident defendant is constitutionally permissible where

11

the defendant has "minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 316 (1945) (citation omitted). In *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, the United States Court of Appeals for the Fourth Circuit explained:

> The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit. If those contacts form the basis for the suit, they may establish "specific jurisdiction." In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 711–12 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105, 123 S.Ct. 868, 154 L.Ed.2d 773 (2003); *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state. To establish general jurisdiction, the defendant's activities in the state must have been "continuous and systematic." *ALS Scan*, 293 F.3d at 712; *see Helicopteros*, 466 U.S. at 414 & n.9, 104 S.Ct. 1868.

334 F.3d 390, 397 (4th Cir. 2003).

"[E]ven a single act" between a non-resident defendant and the forum state may establish personal jurisdiction if it creates a "substantial connection" with the state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n.18 (1985). Also relevant is whether "the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see Planet Techs., Inc. v. Planit Tech. Grp., LLC*, 735 F. Supp. 2d 397, 401–404 (D. Md. 2010) (citing *Burger King*

*Corp.,* 471 U.S. at 476).

Here, as described above, Plaintiffs proceed, at least chiefly, on a specific jurisdiction theory against Defendant Santulli, and so the court will constrain its analysis to Defendant Santulli's alleged conduct giving rise to the suit. "Accordingly, it is only if (1) [Defendant] purposefully availed [himself] of the privilege of conducting activities in Maryland, (2) [Plaintiffs'] claims arise out of those activities, and (3) the exercise of personal jurisdiction would be constitutionally 'reasonable', that [Defendant] can be subject to specific jurisdiction in Maryland." *Carefirst*, 334 F.3d at 397.

The Complaint expressly alleges that Defendant Santulli, as founder and CEO of Rx Valet, and President of Advanced Pharmacy, is "intimately involved" with the entities' "importation of international prescription drugs," including BIKTARVY®. (Complaint, ECF No. 1 ¶ 75.) But Plaintiffs do not rest on generalized implications based on Mr. Santulli's titles. Importantly, Plaintiffs charge that Mr. Santulli "controls both companies," and specifically that he "directs, approves, and supervises both companies' advertising, sales, and importation of infringing international Gilead-branded medicines." *Id.* Plaintiffs further expressly describe Mr. Santulli as "an active and moving force behind both companies' infringement. Santulli directly financially benefits from his companies' infringement." *Id.* Plaintiffs' allegations, at a 12(b)(2) stage, do not rest on generalized parroting of legal elements or jurisdictional grounds; they describe specific actions and responsibilities essential and elementary to the alleged trademark infringement scheme of which they complain – the advertising and fulfilling of U.S. prescriptions with international infringing Gilead-branded medicines.

Defendant Santulli is alleged to have directed and controlled Rx Valet's advertisement of internationally sourced Gilead-branded drugs, including BIKTARVY®; he is alleged to have

13

directed and controlled Advanced Pharmacy's advertisement that it is Rx Valet's "mail order home delivery pharmacy" with its link appearing on Rx Valet's website. He is alleged, as the moving force and lead officer, to have directed, supervised, and controlled the scheme by which Doe was directed by Rx Valet to have his physician re-direct his prescription for fulfillment by Advanced Pharmacy for the unlawful provision of international BIKTARVY®. And, Plaintiffs allege, Defendant Santulli stands to, and does, directly financially benefit from this concerted scheme as the CEO of Rx Valet and President of Advanced Pharmacy. Also notable is the Complaint's allegation at paragraph 66 that Rx Valet regularly works with American patients, U.S. health plans, and PBS to conduct this scheme on a large scale with "enormous illicit financial awards for its infringement." Santulli, Plaintiffs allege, is the "moving force" behind it all.

From a due process perspective, all of this militates in favor of the exercise of personal jurisdiction over Mr. Santulli. In part because of the ease with which an individual can simply transport a business scheme from one entity under legal attack to a newly created entity, corporate officers risk liability if found to have directed and controlled infringement through corporate acts. It matters not that Mr. Santulli may never have come to the State of Maryland if, as here, it is alleged that he engaged in intentional infringement, felt in Maryland by Gilead based on the provision of infringing Gilead product to a known Maryland patient, and which services were sold and advertised in Maryland (as is alleged here). *Planet Techs, Inc. v. Planit Tech. Grp., LLC*, 735 F. Supp. 2d 397, 401-404 (D. Md. 2010); *Calder v. Jones,* 465 U.S. 783, 789–90 (1984); *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009); *see also Polo Fashions, Inc. v. Craftex,* 816 F.2d 145, 149 (4th Cir. 1986) (holding that "[a] corporate official may be held personally liable for tortious conduct committed by him, though committed primarily for the benefit of the corporation. This is true in trademark infringement and unfair trade practices

cases"); and *Rothy's, Inc. v. JKM Tech., LLC*, 360 F. Supp.3d 373, 380 (W.D. Va. 2018) (citing *Polo Fashions*, *Inc.*, and other cases, to explain that in Fourth Circuit "trademark infringement and unfair trade practices cases, '[a] corporate official may be held personally liable" for infringement committed for the primary benefit of the entity, and that motions to dismiss have been denied under this "rubric" in Lanham Act cases alleging that "the individual defendant: (1) was 'president and principal stockholder' of the corporation and 'participated' in infringement; (2) 'unfairly appropriated the success and reputation of [the plaintiff] as well as the trademark [at issue] and parlayed them into business for [the corporation]'; (3) 'personally participated in the selection of the [offending company] name' and 'authorized and approved . . . counsel [to] file a trademark registration application'; and (4) 'is the resident agent and incorporator' of the corporation, 'filed its articles of organization to create a name confusingly similar to' plaintiff 'for the purpose of selling [products] in competition with plaintiff,' and 'participated in alleged violations of the Lanham Act,' even though the 'allegations as to [the individual defendant] border on thin[.]' The common thread throughout these cases is that the plaintiff levies some particularized allegations against the individual defendant—that is, the individual defendant undertook some particular action vis-à-vis the underlying Lanham Act claims.") (citations omitted).

Defendant Santulli's affidavit – even credited entirely – does not present evidence to refute the specific jurisdictional allegations of the Complaint and, in some instances, bolsters them. As described earlier, according to his affidavit, Mr. Santulli owns no real property in Maryland, pays no taxes in the jurisdiction, and has not been physically present in the State for five years. As for Rx Valet and Advanced Pharmacy, of which attests he is founder and CEO, and President, respectively: Mr. Santulli is careful to observe the corporate structure and the requisite formalities, including no comingling of funds. He does not "personally control the day-to-day business

operations of either" entity; he does not answer the customer service lines; he does not contact customers or follow up with customers on prescription orders; and he does "not personally supervise the day-to-day activities of the employees who conduct these operations." (ECF No. 106-2.) Mr. Santulli adds that he is the sole member of Advanced Pharmacy, and one of three members of Rx Valet (both LLCs).

Accepting Mr. Santulli's attestations as true, he asserts nothing to contravene Plaintiffs' clear allegations that he is the controlling and moving force behind the intentional infringement scheme of Rx Valet and Advanced Pharmacy, and that he directs and controls it all, including the advertising, importation, and sales of Gilead-branded international drugs including BIKTARVY®. *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993) (holding that "[i]n deciding whether the plaintiff has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor.") If Plaintiffs' allegations are true, it is entirely fair, and Mr. Santulli can claim no surprise, that he is required to appear before a court within the State of Maryland.

For the foregoing reasons, the court finds Plaintiffs make a *prima facie* showing of personal jurisdiction over Defendant Santulli. Plaintiffs' alternative request for jurisdictional discovery is denied as moot; and the court declines to reach the question of waiver.

### IV. CONCLUSION

For the reasons set forth herein, by separate order, Defendant Gregory Santulli's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 106) is denied.

/S/

_____
Julie R. Rubin
April 19, 2025                                        United States District Judge