**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| GILEAD SCIENCES, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:24-cv-03566-JRR |
| v. | ) | |
| | ) | |
| MERITAIN HEALTH, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

# DEFENDANTS SCRIPTSOURCING, LLC AND GARY BECKER'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT


Arnie B. Mason
Maryland Bar No. 21306
WILLIAMS MULLEN
8350 Broad Street, Suite 1600
Tysons, VA 22102
(703) 760-5235
amason@williamsmullen.com

Steven M. Kushner*
Ethan M. Knott*
Alisha Goel*
*admitted *pro hac vice*
FELLOWS LABRIOLA LLP
Suite 2400 Harris Tower
233 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 586-9200
skushner@fellab.com
eknott@fellab.com
agoel@fellab.com

*Counsel for Defendants ScriptSourcing, LLC and Gary Becker*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

I. INTRODUCTION ..... 1

II. BACKGROUND ..... 2

A. Factual Background ..... 2

1. The John Doe transaction did not involve the ScriptSourcing Defendants. ..... 2

2. The FAC alleges that ScriptSourcing openly conducts an international sourcing program. ..... 3

B. Procedural History ..... 4

III. LEGAL STANDARD ..... 6

IV. ARGUMENT ..... 6

A. Counts I and II fail because the FAC does not adequately allege that ScriptSourcing openly disclosed international program is likely to cause confusion. ..... 6

1. Neither this Court nor the Fourth Circuit has decided whether a disclosed international program confuses consenting members, so that question is open here. ..... 8

2. The FAC does not adequately allege a likelihood of confusion because members who knowingly choose foreign-market Gilead medicine are not confused by the differences that may come with it. ..... 9

3. The FAC does not adequately allege that members who rely on CanaRx, not Gilead, to arrange delivery of their medicine expect Gilead's quality controls. .. 12

4. The FAC's general confusion allegations are conclusory and contradicted by its specific allegations as to the ScriptSourcing Defendants. ..... 14

5. Count I's contributory- and vicarious-liability theory fails because the FAC does not adequately allege an underlying direct infringement. ..... 16

B. Count II also fails because the FAC does not allege that either ScriptSourcing Defendant made a false or misleading representation of fact. ..... 17

C. Count III fails because Maryland common-law unfair competition requires the same likelihood of confusion that the FAC does not adequately allege. ..... 18

D. Count IV fails because Gilead does not allege that it conferred a benefit on either ScriptSourcing Defendant or that the alleged enrichment is unjust. ..... 19

E. Count V fails because Gilead seeks relief under 15 U.S.C. § 1116 for an alleged violation of 15 U.S.C. § 1124, which provides no private right of action. ..................... 20

F. Count VI fails because the FAC does not allege an underlying unlawful act. ............... 22

G. Dismissal of Counts I through VI should be with prejudice because amendment would be futile. ........................................................................................................ 25

V. CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Adelphia Supply USA*,
2024 WL 4250223 (E.D.N.Y. Aug. 22, 2024) ... 22

*AbbVie Inc. v. Payer Matrix, LLC*,
2026 WL 1846752 (N.D. Ill. June 26, 2026) ... passim

*Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*,
340 Md. 176 (1995) ... 23

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 6, 14, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 6, 24

*Blanchard v. Dorchester St. Jet Skis Inc.*,
2026 WL 2983199 (D. Md. Oct. 5, 2026) ... 23

*Chambers v. King Buick GMC, LLC*,
43 F. Supp. 3d 575 (D. Md. 2014) ... 24

*Gilead Scis., Inc. v. Meritain Health, Inc.*,
187 F.4th 139 (4th Cir. 2026) ... passim

*Hill v. Cross Country Settlement, LLC*,
402 Md. 281 (2007) ... 20

*Hoffman v. Stamper*,
385 Md. 1 (2005) ... 22, 23, 24

*Iberia Foods Corp. v. Romeo*,
150 F.3d 298 (3d Cir. 1998) ... 8

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
193 F.3d 781 (3d Cir. 1999) ... 23

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ... 6

*Laber v. Harvey*,
438 F.3d 404 (4th Cir. 2006) ... 25

*Lamparello v. Falwell*,
420 F.3d 309 (4th Cir. 2005) ... 7

*Mylan Labs., Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) .......... 17, 18

*Nike, Inc. v. B&H Customs Servs., Inc.*,
565 F. Supp. 3d 498 (S.D.N.Y. 2021) .......... 21, 22

*Novartis Animal Health US, Inc. v. Abbeyvet Exp. Ltd.*,
409 F. Supp. 2d 264 (S.D.N.Y. 2005) .......... 11

*Philip Morris USA, Inc. v. Lee*,
481 F. Supp. 2d 742 (W.D. Tex. 2006) .......... 21

*Polo Fashions, Inc. v. Craftex, Inc.*,
816 F.2d 145 (4th Cir. 1987) .......... 7

*Rosetta Stone Ltd. v. Google, Inc.*,
676 F.3d 144 (4th Cir. 2012) .......... 7, 8, 16, 19

*Scotch Whisky Ass'n v. Majestic Distilling Co.*,
958 F.2d 594 (4th Cir. 1992) .......... 19

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) .......... 6, 19

*Shell Oil Co. v. Com. Petroleum, Inc.*,
928 F.2d 104 (4th Cir. 1991) .......... 7

*Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*,
982 F.2d 633 (1st Cir. 1992) .......... 21

*Webster v. Fall*,
266 U.S. 507 (1925) .......... 21

**Statutes**

15 U.S.C. § 1114(1) .......... 6, 7

15 U.S.C. § 1116 .......... ii, 20, 21

15 U.S.C. § 1116(a) .......... 20, 21

15 U.S.C. § 1124 .......... 20, 21, 24, 25

15 U.S.C. § 1125(a) .......... passim

**Rules**

Federal Rules of Civil Procedure 10 .......... 7

Federal Rules of Civil Procedure 12(b)(6)........................................................................ 1, 6

Federal Rules of Civil Procedure 8 ................................................................................... 7

Federal Rules of Civil Procedure 8(a)(2)........................................................................ 1, 6

Defendants ScriptSourcing, LLC ("ScriptSourcing") and Gary Becker ("Becker") (together, the "ScriptSourcing Defendants"), and pursuant to Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6), submit this Memorandum of Law ("Memo") in Support of ScriptSourcing Defendants' Motion to Dismiss (the "Motion") the First Amended Complaint [ECF No. 296] (the "FAC") filed against them by Plaintiffs Gilead Sciences, Inc. and Gilead Sciences Ireland UC (together, "Gilead").

## I. INTRODUCTION

Every claim against the ScriptSourcing Defendants fails on the merits. Gilead's own allegations show that the ScriptSourcing Defendants' program is openly international and, therefore, cannot plausibly confuse anyone about Gilead's marks appearing on foreign-market Gilead medication. Several of Gilead's claims also fail for additional, independent reasons. Because Gilead's failure to adequately allege a likelihood of confusion arises from its own allegations, and Gilead's remaining theories fail as a matter of law, amendment would be futile and the dismissal should be with prejudice.

This case began with an alleged transaction that, even as alleged, did not involve the ScriptSourcing Defendants in any way. According to Gilead, a Maryland patient, "John Doe," who was covered by an employer-sponsored health plan administered by Defendant Meritain, had taken U.S. BIKTARVY® for years. Gilead alleges that when he asked to have his BIKTARVY® prescription filled, he received, without being told, Turkish-labeled product shipped from a pharmacy in Istanbul. (FAC ¶¶ 48–60, 201.) On those allegations, this Court and the Fourth Circuit treated the purported bait-and-switch as gray-market infringement. Gilead then added the ScriptSourcing Defendants and seven other new defendants in the FAC, a seventy-six (76) page amended pleading that asserts its counts against all sixteen defendants collectively.

Even when the Court accepts Gilead's factual allegations as true, the FAC fails on the merits. Gilead's trademark and unfair-competition counts (Counts I through III) each require a likelihood that consumers will be confused about Gilead's marks, and its remaining counts either depend on that same theory or fail for independent reasons. Gilead's theory does not allege prescription counterfeiting, but rather that authentic Gilead medicine made and labeled for sale outside the United States ("foreign-market Gilead medicine") differs from the Gilead medicine sold here ("U.S. Gilead medicine"). The FAC alleges that ScriptSourcing "publicly advertise[s] the fact that [it] offer[s] 'international sourcing'" (*id.* ¶ 269) and is paid by health plans specifically to obtain "international medicines obtained from foreign sources" (*id.* ¶ 177).

Yet a member who knowingly chooses foreign-market Gilead medicine can not be and is not confused when foreign-market Gilead medicine arrives. The Northern District of Illinois dismissed materially identical Lanham Act claims against a disclosed international-sourcing program for exactly this reason. *See AbbVie Inc. v. Payer Matrix, LLC*, No. 23 CV 2836, 2026 WL 1846752, at *25–27 (N.D. Ill. June 26, 2026). The Fourth Circuit frames the confusion question the same way — "whether the product received matches what one reasonably expects when seeing Gilead's mark" — and left open whether disclosure to end users defeats confusion. *Gilead Scis., Inc. v. Meritain Health, Inc.*, 187 F.4th 139, 158 & n.13 (4th Cir. 2026). This Motion answers that question in the affirmative, and the remaining counts fall with that theory or on their own.

## II. BACKGROUND

### A. Factual Background

#### 1. The John Doe transaction did not involve the ScriptSourcing Defendants.

As noted above, the Turkish-labeled BIKTARVY® story set forth in the Complaint and FAC is completely unrelated to the ScriptSourcing Defendants. Moreover, unlike anything the

ScriptSourcing Defendants are involved with, the consumer did not choose to participate in international sourcing of his medications. (FAC ¶¶ 48–66.)

The FAC alleges generally that ScriptSourcing has imported Gillead-branded products "including international GENVOYA®." (*Id.* ¶ 174.) But the only specific ScriptSourcing transaction involving a Gilead product that the FAC identifies is an alleged client invoice for GENVOYA® that Defendant Meritain paid and that "stated on its face that the GENVOYA® was obtained through an International Prescription Program." (*Id.* ¶ 202.) The FAC also alleges that ScriptSourcing once arranged delivery of an unidentified "prescription drug product" that "turned out to be counterfeit." (*Id.* ¶ 178.) As to Becker, the FAC alleges that he founded ScriptSourcing, promotes and signs agreements for its program, and is "an active and moving force" behind it. (*Id.* ¶¶ 181–186.)

### 2. The FAC alleges that ScriptSourcing openly conducts an international sourcing program.

The FAC alleges that ScriptSourcing is a Maryland limited liability company, and Becker is its founder, chief executive officer, sole member, and registered agent. (*Id.* ¶¶ 28–29.) The FAC also alleges that ScriptSourcing partners with benefits consultants, pharmacy benefit managers ("PBMs"), and third-party administrators to provide "alternative medication sourcing options" (*id.* ¶¶ 28, 173), and that it "provides international medicines obtained from foreign sources only for insured U.S. patients whose health insurance is paying ScriptSourcing to obtain those medicines" (*id.* ¶ 177). The FAC further alleges that ScriptSourcing "advertises the availability of . . . **international** Gilead medicines to patients and health insurance companies" (*id.* ¶ 175 (emphasis added)); has "partnered with Defendant CanaRx" (*id.* ¶ 176); and "publicly advertise[s] the fact that [it] offer[s] '**international sourcing**' for 'brand-name' prescription medications" (*id.* ¶ 269 (emphasis added)). The FAC describes the enrollment forms of Defendants CanaRx and CRX, and

alleges that they offer patients "FREE Brand Name Medications," including GENVOYA®, "from **international sources**." (*Id.* ¶¶ 128(b)–(c), 131–132 (emphasis added).)

The FAC alleges that ScriptSourcing works with Defendant CanaRx, which the FAC defines to include three entities (*id.* ¶ 23), and Defendant Meritain. According to Gilead, ScriptSourcing has "partnered with Defendant CanaRx to advertise and provide" **international medicines**, including Gilead medicines, to insured U.S. patients. (*Id.* ¶ 176.) And Gilead alleges that Defendant Meritain, a third-party administrator, processed ScriptSourcing's invoices (*id.* ¶ 67(b)), including the GENVOYA® invoice described above (*id.* ¶ 202), and Meritain "implemented ScriptSourcing's programs for clients who used Meritain's in-house PBM" (*id.* ¶ 216). The FAC does not specifically allege that either ScriptSourcing Defendant worked with any other defendant.

### B. Procedural History

In December 2024, Gilead sued seven defendants, alleging that they caused John Doe to receive Turkish-labeled BIKTARVY® in place of the U.S. Gilead medicine he had been taking. (Compl. [ECF No. 1] ("Compl.") ¶¶ 11–17, 31–43.) Gilead did not allege that the Turkish BIKTARVY® was counterfeit, but instead alleged that the product was authentic Gilead medicine manufactured, packaged, and labeled for sale in Turkey, and that it infringed Gilead's marks because it is materially different from the BIKTARVY® that Gilead sells in the United States and was distributed outside Gilead's quality controls. (*Id.* ¶¶ 7, 46, 60, 117, 149.) On June 24, 2025, this Court preliminarily enjoined the seven original defendants (Mem. Op. [ECF No. 244] ("PI Op.") at 60; June 24, 2025 Order [ECF No. 245] at 1), and the Fourth Circuit affirmed. *Meritain*, 187 F.4th at 168. The ScriptSourcing Defendants were not parties to those proceedings. This Court's preliminary-injunction ruling concerned John Doe, who received Turkish BIKTARVY®

"instead of the U.S. BIKTARVY® he had been taking and expected to receive." PI Op. at 11 n.9; *see id.* at 52.

On October 12, 2025, with the Court's leave, Gilead filed the FAC. (October 12, 2025 Order [ECF No. 295] at 9–10.) The FAC makes three changes. First, it adds nine additional defendants, including the ScriptSourcing Defendants. (FAC ¶¶ 21–29.) Second, it asserts the Complaint's six claims against the new defendants. Third, it adds allegations about each new defendant (*id.* ¶¶ 125–186) and about the original defendants' dealings with the new defendants that Gilead says it learned in discovery (*e.g.*, *id.* ¶¶ 67–68, 202, 216). The FAC otherwise carries forward the Complaint's allegations about John Doe and Gilead's theory of infringement. (*Id.* ¶¶ 48–66, 218–254, 257.) The FAC asserts six counts: federal trademark infringement under 15 U.S.C. § 1114(1) (Count I); federal unfair competition under 15 U.S.C. § 1125(a) (Count II); unfair competition under state law (Count III); unjust enrichment (Count IV); importation of goods bearing infringing marks under 15 U.S.C. § 1124 (Count V); and civil conspiracy (Count VI). (*Id.* ¶¶ 255–297.) Every count except Count IV is pleaded "[a]gainst all Defendants[;]" Count IV is pleaded against fourteen defendants, including the ScriptSourcing Defendants. (*Id.*)

On October 23, 2025, the Court granted Gilead's motion for a temporary restraining order against the new defendants, including the ScriptSourcing Defendants. (October 23, 2025 Order [ECF No. 326] at 1.) At the hearing, the Court explained that its findings were made "relative to the Turkish Biktarvy phase of this case" and "for purposes of establishing the Winter factors," and that the new defendants "remain entitled to basically knock me off that hill, as far as the facts are established with respect to your clients." (Tr. of Oct. 23, 2025 Hr'g [ECF No. 328] ("TRO Hr'g Tr.") at 158:1–9.) The Court also observed that John Doe, who "believed he was getting American

Biktarvy," presented "a different scenario." (*Id.* at 138:15–23.) On October 31, 2025, the new defendants stipulated to the entry of injunctive relief. [ECF No. 335].

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion under FED. R. CIV. P. 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV. ARGUMENT[1]

### A. Counts I and II fail because the FAC does not adequately allege that ScriptSourcing openly disclosed international program is likely to cause confusion.

Count I asserts federal trademark infringement under 15 U.S.C. § 1114(1), and Count II asserts federal unfair competition under 15 U.S.C. § 1125(a). (FAC ¶¶ 255–276.) Gilead asserts

[1] Counts II through VI fail at the threshold, because those counts incorporate only paragraphs 1 through 149 (FAC ¶¶ 266, 277, 281, 290, 293), which mention the ScriptSourcing Defendants only in summary terms; the FAC's specific allegations about them appear in paragraphs 173 through 186, 202, 209, and 216. Where a complaint "fails to allege particular facts against a particular defendant, then the defendant must be dismissed." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 905 (6th Cir. 2009)). The October 12, 2025, Order [ECF No. 295] is not to the contrary: that Order rejected objections under FED. R. CIV. P. 8 and 10 to the length and complexity of the proposed pleading, but did not address whether each count pleads particular facts against each new defendant. October 12, 2025, Order at 8–9. This Memo shows that each count also fails when read together with the FAC's allegations about the ScriptSourcing Defendants, wherever those allegations appear, and the analysis that follows relies on them on that basis.

both counts against all sixteen defendants, including the ScriptSourcing Defendants.[2] (*Id.*.) Count I incorporates every preceding paragraph of the FAC (*id.* ¶ 255), while Count II incorporates only paragraphs 1 through 149 (*id.* ¶ 266). Gilead advances two theories of confusion for Counts I and II (*id.* ¶¶ 257, 267), tracking the two grounds on which this Court and the Fourth Circuit found foreign-market Gilead medicine not "genuine[:]" material differences and departure from Gilead's quality controls. *See Meritain*, 187 F.4th at 160. Under both theories, Gilead alleges that "patients . . . are likely to believe Gilead authorizes and controls the sale and importation of international Gilead medications[.]" (FAC ¶¶ 258, 268.)

The same elements govern a trademark-infringement claim under 15 U.S.C. § 1114(1) and an unfair-competition claim under 15 U.S.C. § 1125(a) based on the use of a mark: each requires a likelihood of confusion. *See Lamparello v. Falwell*, 420 F.3d 309, 312-13 (4th Cir. 2005). A plaintiff must show (1) "that it owns a valid mark;" (2) that the defendant used the mark in commerce without the plaintiff's authorization; (3) "that the defendant used the mark (or an imitation of it) 'in connection with the sale, offering for sale, distribution, or advertising' of goods or services;" and (4) "that the defendant's use of the mark is likely to confuse consumers."[3] *Rosetta Stone Ltd. v. Google, Inc.*, 676 F.3d 144, 152 (4th Cir. 2012).

---

[2] Gilead's claims against Becker rest on his role at ScriptSourcing. (FAC ¶ 186 (alleging that Becker is "an active and moving force behind ScriptSourcing's acts of infringement").) A corporate official may be held personally liable for "tortious conduct committed by him," *Polo Fashions, Inc. v. Craftex, Inc.*, 816 F.2d 145, 149 (4th Cir. 1987), and the FAC does not adequately allege any tortious conduct. Each count therefore fails as to Becker for the same reasons it fails as to ScriptSourcing.

[3] When the defendant resells the trademark owner's own product, a court "must decide whether [the defendant] sold a 'genuine' product . . . in order to determine whether trademark law applies." *Shell Oil Co. v. Com. Petroleum, Inc.*, 928 F.2d 104, 107 (4th Cir. 1991). This Court and the Fourth Circuit held that foreign-market Gilead medicines are not genuine on two independent grounds: they omit "warnings, prescribing information, FDA-related disclosures, and identifying

Under the material-differences doctrine, imported goods bearing a genuine mark are not genuine, and their sale is likely to cause confusion, if "(1) the trademark owner hasn't authorized them for domestic sale, and (2) they materially differ from the goods authorized for sale domestically." *Meritain*, 187 F.4th at 155. That test rests on consumer expectation: "consumers who encounter products bearing identical marks reasonably expect them to have the same characteristics," and "[m]aterial differences undermine that expectation and therefore create a likelihood of confusion." *Id.* (citing *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 303 (3d Cir. 1998)). When consumers "get precisely what they believed that they were purchasing," however, their "perceptions of the trademarked goods are not likely to be affected." *Iberia Foods*, 150 F.3d at 303 (internal quotation marks and citation omitted); *see also Meritain*, 187 F.4th at 154–55 (citing *Iberia Foods*). The Fourth Circuit framed the question as "whether the product received matches what one reasonably expects when seeing Gilead's mark." *Meritain*, 187 F.4th at 158. The Fourth Circuit did not decide whether disclosure to end users defeats confusion, because the appellants had waived that argument. *Id.* at 158 n.13.

**1. Neither this Court nor the Fourth Circuit has decided whether a disclosed international program confuses consenting members, so that question is open here.**

The prior rulings in this case arose from allegations regarding John Doe's undisclosed medication substitution, and the Fourth Circuit expressly left open whether disclosure to end users defeats confusion. *Id.* The Fourth Circuit's rejection of the argument that a consumer could "reconstruct what's missing after the fact" addressed a consumer who discovers the foreign origin of the medication only after the product arrives. *Id.* at 158. The *AbbVie* court accordingly read

information" that consumers "would likely consider relevant," and they "reach consumers while skirting Gilead's quality-control system." *Meritain*, 187 F.4th at 157, 160; *see* PI Op. at 24. Gilead therefore must adequately allege all four *Rosetta Stone* elements, including likelihood of confusion.

this Court's decision as a case of "Turkish medication sold to U.S. consumer without disclosure or consent." 2026 WL 1846752, at *26. The Court's temporary-restraining-order ruling does not resolve the question either, because the Court made its findings for purposes of interim relief "relative to the Turkish Biktarvy phase of this case." (TRO Hr'g Tr. at 158:1–9; October 23, 2025 Order [ECF No. 326] at 1.) Whether ScriptSourcing's disclosed program is likely to confuse its members is therefore a question presented to this Court for the first time on this Motion.

**2. The FAC does not adequately allege a likelihood of confusion because members who knowingly choose foreign-market Gilead medicine are not confused by the differences that may come with it.**

Gilead's first theory for confusion is that foreign-market Gilead medicine is "materially different" from U.S. Gilead medicine. (FAC ¶¶ 257, 267.) Gilead relies on the differences between Turkish and U.S. BIKTARVY® (*id.* ¶¶ 219–230), which Gilead calls "illustrative" of all foreign-market Gilead medicine (*id.* ¶ 231), and on differences common to all foreign-market Gilead medicine, such as the absence of a U.S. National Drug Code and U.S. patient information (*id.* ¶¶ 231–233). Gilead has also argued that disclosing that medicine comes from abroad is not disclosing "the differences." (TRO Hr'g Tr. at 141:21–142:13.) That theory fails as to the ScriptSourcing Defendants because a member who knowingly chooses foreign-market Gilead medicine expects the differences that come with it.

Gilead admits that ScriptSourcing publicly advertises "international sourcing" (FAC ¶ 269), advertises "international Gilead medicines to patients" (*id.* ¶ 175), and is paid by health plans specifically "to obtain" "international medicines obtained from foreign sources" (*id.* ¶ 177). The single specific ScriptSourcing transaction identified in the FAC is a client invoice, processed by Defendant Meritain as a third-party administrator, that disclosed the "International Prescription Program" "on its face[.]" (*Id.* ¶ 202.) The FAC does not specifically allege that any member of the ScriptSourcing Defendants' program sought U.S. Gilead medicine and received foreign-market

Gilead medicine without being told. Gilead's allegations describe an informed purchase, not confusion, at every level of the alleged transaction. A health plan that pays ScriptSourcing for the very purpose of obtaining "international medicines obtained from foreign sources" (*id.* ¶ 177) cannot plausibly be confused about whether it is receiving foreign-market medicine. Nor do the FAC's allegations that Meritain "implemented ScriptSourcing's programs" for clients of its in-house pharmacy benefit manager describe members who are steered into foreign-market Gilead medicine without their knowledge. (*d.* ¶ 216.) The FAC admits that ScriptSourcing has "partnered with Defendant CanaRx" to provide international medicines (*id.* ¶ 176); that patients in CanaRx's program must themselves "enroll" by "entering an agreement with CanaRx Group," whose enrollment form tells them they may obtain brand-name medicines "from international sources" (*id.* ¶ 128(b)); and that patients provide CanaRx with copies of their prescriptions before a foreign entity ships any medicine (*id.* ¶ 133). The FAC's generalized assertions that patients are "pressured" to use CanaRx (*id.* ¶ 130) and that Defendants "force, trick, or push" patients (*id.* ¶ 1) do not change the analysis. Pressure to choose a disclosed foreign source is not confusion about what that source supplies, and none of those assertions alleges that any member of ScriptSourcing's program did not know that the medicine would come from abroad.

*AbbVie*, which applied the material-differences doctrine to an identical disclosed international program for prescription medicine, held that the plaintiff failed to state a claim on similar allegations. In *AbbVie*, members completed forms stating that their medicine would be "dispensed by the foreign Pharmacy" and authorized the defendant program, "not [the plaintiff] AbbVie," to facilitate the order. 2026 WL 1846752, at *25. The question, the court explained, was "whether the specific differences between AbbVie medications sold in Canada and those sold in the United States would 'confuse consumers' who knowingly purchase medications sourced from

international pharmacies. The answer is no." *Id.* The differences AbbVie alleged —labels without FDA approvals and warnings, no FDA reporting or U.S. patient-support numbers, metric units, and no U.S. notice of foreign recalls — were "exactly the differences that Payer Matrix's customers would reasonably expect from medications purchased internationally" and "could not reasonably confuse Payer Matrix's consenting members." *Id.* The court distinguished these variances "inherent to the differences between the Canadian and U.S. pharmaceutical markets" from those that a knowing purchaser would not expect, such as unflavored rather than flavored pills in different dosages. *Id.* at *26 (discussing *Novartis Animal Health US, Inc. v. Abbeyvet Exp. Ltd.*, 409 F. Supp. 2d 264, 266 (S.D.N.Y. 2005)). The differences Gilead pleads here, including the absence of U.S. patient information with Gilead's toll-free hotline and FDA contact information (FAC ¶ 232) and the absence of a U.S. National Drug Code (*id.* ¶ 233), are of the kind inherent to the differences between U.S. and foreign pharmaceutical markets and therefore are not likely to confuse an informed purchaser of foreign pharmaceuticals. (*Compare id.* ¶¶ 231–233, *with AbbVie*, 2026 WL 1846752, at *24–25.) For the same reason, Gilead's argument that disclosing that medicine comes from abroad is not disclosing "the differences" fails. (TRO Hr'g Tr. at 141:21–142:13.) The Fourth Circuit's question is whether the product "matches what one reasonably expects," *Meritain*, 187 F.4th at 158, not whether each difference was separately itemized. Differences inherent in buying medicine abroad are ones a knowing purchaser "would reasonably expect," and so they "could not reasonably confuse" consenting members. *See AbbVie*, 2026 WL 1846752, at *25. Gilead's own pleading confirms the point. The FAC alleges that CanaRx, ScriptSourcing's alleged partner, "distributes a disclaimer to U.S. patients acknowledging that the medicine it provides differs from the same medicine intended for sale in the United States." (FAC ¶ 141.) That allegation appears within paragraphs 1 through 149, which

every count incorporates, and it shows that members are told not only that their medicine comes from abroad but also that it may differ from U.S. medicine. The FDA's reported concern, recited in the same paragraph, that patients may trust products provided through their insurance benefits (*id.*) is a regulatory policy concern, not an allegation that any member of ScriptSourcing's program was confused about Gilead's marks.

**3. The FAC does not adequately allege that members who rely on CanaRx, not Gilead, to arrange delivery of their medicine expect Gilead's quality controls.**

Gilead's second theory for confusion is that foreign-market Gilead medicine reaches patients outside Gilead's quality controls. Gilead alleges that importing foreign-market Gilead medicine "violates and undermines Gilead's established and non-pretextual quality-control procedures" (FAC ¶ 267), and that foreign-market Gilead medicine lacks Gilead's U.S. temperature-controlled shipping, U.S. recall coverage, and U.S. supply-chain pedigrees (*id.* ¶¶ 234–249). While the Fourth Circuit held that a quality-control departure independently "supports a likelihood of confusion," *Meritain*, 187 F.4th at 160, that holding rested upon an assumption that the customer was not informed of the international source of the medication.

The Fourth Circuit explained that a departure from Gilead's quality controls creates confusion because a consumer "has no way of knowing" that the medicine traveled outside Gilead's quality controls, "[y]et the consumer reasonably expects that the medicine bearing Gilead's marks has been subjected to all of these Gilead safeguards." *Id.* at 159. That assumption does not apply here, because members of ScriptSourcing's program do know that the medicine travelled outside of Gilead's U.S. safeguards. The FAC's own allegations admit as much. It admits that ScriptSourcing has partnered with Defendant CanaRx to provide international medicines (FAC ¶ 176) and that patients in CanaRx's program must "enroll" by "entering an agreement with CanaRx Group," whose enrollment form tells them they may obtain brand-name medicines "from

international sources" (*id.* ¶ 128(b)); that CanaRx refers each prescription to "a foreign entity . . . which will ship medicine directly to a U.S. patient" (*id.* ¶ 133); and that the enrollment forms release "the company or agency responsible for transporting" the medicine (*id.* ¶ 132). On the FAC's own account, members choose a foreign sourcing program, contract with someone other than Gilead to obtain their medicine directly from a foreign country, and acknowledge that a third party will deliver it. A member who makes those choices does not expect the medicine to have passed through Gilead's domestic quality controls.

As in *AbbVie*, a theory based on the manufacturer's shipping controls "is obviated by the fact that [the program's] members seeking non-U.S. drugs authorize [the program] (that is, not AbbVie) to facilitate packing and delivery." *AbbVie*, 2026 WL 1846752, at *25. The *AbbVie* court reached the same conclusion about supply-chain and regulatory protections. The manufacturer in *AbbVie* alleged that its foreign-market drugs were "not subject to U.S. supply-chain protections" and that their labels did "not show FDA regulatory approvals, warnings, and recommendations." *Id.* The *AbbVie* court held that "it should be obvious to [the program's] members that the imported drugs do not undergo U.S. regulatory processes because they are sourced from Canadian pharmacies," and that those differences were "inherent to the Canadian market and could not reasonably confuse [the program's] consenting members." *Id.* (internal quotation marks and citation omitted).

The same is true of the protections Gilead invokes: Gilead's U.S. supply-chain pedigrees, U.S. recall coverage, and temperature-controlled shipping (FAC ¶¶ 234–249) are features of the U.S. distribution system, and a member who chooses a foreign sourcing program knows that the medicine does not travel through that system. *See AbbVie*, 2026 WL 1846752, at *25. The FAC's conclusory allegation that a ScriptSourcing member once received a counterfeit "prescription drug

product" (FAC ¶ 178) does not change the analysis, even if accepted as true for the purposes of the Motion. The FAC does not allege that the product was a Gilead product or bore a Gilead mark, and is not illustrative of confusion about Gilead's marks, or anything else. And a member who has agreed that CanaRx, not Gilead, will "arrange for [the member] to receive" the medicine is not confused when the medicine is shipped from Canada and not through Gilead's domestic quality controls. (*See* FAC ¶¶ 128(b), 130.)

**4. The FAC's general confusion allegations are conclusory and contradicted by its specific allegations as to the ScriptSourcing Defendants.**

The FAC's confusion allegation is one sentence, repeated in substantially identical terms against all sixteen defendants:

> Defendants' actions have caused and/or are likely to cause confusion, mistake, or deception as to the source of origin, sponsorship or approval of the international Gilead medication in that patients . . . are likely to believe Gilead authorizes and controls the sale and importation of international Gilead medications, or that Defendants are associated with or related to Gilead or are authorized by Gilead to sell international Gilead medications in the U.S.

(FAC ¶¶ 258, 268, 279, 295.) That sentence is a "[t]hreadbare recital[]" the Court need not accept. *See Iqbal*, 556 U.S. at 678. The FAC likewise asserts, as to every defendant at once, that "[n]one of the Defendants warns the U.S. patients who use their services that they are receiving materially different, non-FDA-approved foreign medicines" and that "all of the Defendants actively attempt to deceive patients into believing they are receiving the same safe, securely supplied medicines that they would receive from a U.S. retail pharmacy." (FAC ¶ 83.) However, as to the ScriptSourcing Defendants, those collective assertions are contradicted by the FAC's own admissions that ScriptSourcing "publicly advertise[s] the fact that [it] offer[s] 'international sourcing' for 'brand-name' prescription medications" (*id.* ¶ 269) and "advertises the availability of . . . international Gilead medicines to patients" (*id.* ¶ 175). So too the FAC's assertion that

ScriptSourcing provides "the same 'international sourcing program' services as Rx Valet" (*id.* ¶ 10): the FAC's specific allegations about ScriptSourcing describe disclosure to members, not the alleged undisclosed substitution that John Doe experienced. (*Compare id.* ¶¶ 128(b), 175, 269, *with id.* ¶ 60.)

Also, the specific statements the FAC quotes as "false reassurance" are all attributed to other defendants. As to ScriptSourcing, paragraph 269 alleges only that it advertises "international sourcing" — a disclosure, not a misrepresentation. (*Id.* ¶¶ 269, 271.) Accordingly, the FAC's confusion allegations against the ScriptSourcing Defendants are entirely conclusory: they are unsupported by any specific allegation of conduct likely to cause confusion and are contradicted, not supported, by the FAC's specific factual allegations. Those confusion allegations therefore fail to state a claim against the ScriptSourcing Defendants.

Nor can paragraph 178 supply the missing confusion. Paragraph 178 alleges that ScriptSourcing once arranged delivery of an unidentified "prescription drug product" that "turned out to be counterfeit." (*Id.* ¶ 178.) The FAC does not allege that the product was a Gilead product or bore a Gilead mark, and "this case is not about counterfeit pharmaceuticals." PI Op. at 12. An alleged counterfeit of some other manufacturer's product says nothing about whether members of ScriptSourcing's program are confused about Gilead's marks, and cannot form a basis for liability to Gilead. Like the manufacturer in *AbbVie*, Gilead does not allege that the ScriptSourcing Defendants imported counterfeit Gilead medicine. *See AbbVie*, 2026 WL 1846752, at *26 (distinguishing a case in which the defendant "was allegedly selling counterfeit medical goods from India" because the manufacturer did "not allege that [the program] is importing counterfeit drugs"); *id.* at *26 n.12 (inference that gaps in supply-chain control would result in counterfeit sales "too speculative to support the requisite consumer confusion").

### 5. Count I's contributory- and vicarious-liability theory fails because the FAC does not adequately allege an underlying direct infringement.

Gilead's secondary-liability theory comes from a single sentence in Count I: "Defendants are directly, contributorily, and/or vicariously liable for the acts of infringement alleged herein." (FAC ¶ 262.) Count I also alleges that Defendants "facilitated the distribution" and "facilitated the sale" of foreign-market Gilead medicine and "paid for the importation" of it. (*Id.* ¶ 257.) No other count alleges contributory or vicarious liability. For there to be liability for contributory trademark infringement, "the plaintiff must establish underlying direct infringement." *Rosetta Stone*, 676 F.3d at 163. "In other words, there must necessarily have been an infringing use of the plaintiff's mark that was encouraged or facilitated by the defendant." *Id.*

To the extent that the FAC alleges that the ScriptSourcing Defendants are contributorily or vicariously liable, which is difficult to discern because the FAC pleads against all sixteen defendants collectively, that theory fails. Paragraph 262 is a bare legal conclusion that the Court need not accept. *See Iqbal*, 556 U.S. at 678. And secondary liability, by definition, requires someone else's infringement. The FAC alleges that ScriptSourcing has partnered with Defendant CanaRx (FAC ¶ 176), which, according to the FAC, refers each prescription to a non-party foreign entity "with which it is contracted" that ships the medicine. (*id.* ¶ 133.) If the members of the ScriptSourcing and CanaRx disclosed programs are not plausibly confused, no one in that chain directly infringes, and there is nothing to which contributory or vicarious liability may attach. In short, regarding Counts I and II, the FAC alleges that members of ScriptSourcing's program knowingly choose foreign-market Gilead medicine through a program that tells them so, and as a result the ScriptSourcing Defendants' alleged actions do not create any likelihood of confusion. Counts I and II therefore fail as to the ScriptSourcing Defendants.

**B. Count II also fails because the FAC does not allege that either ScriptSourcing Defendant made a false or misleading representation of fact.**

Count II asserts federal unfair competition under 15 U.S.C. § 1125(a) against all sixteen defendants, including the ScriptSourcing Defendants. (FAC ¶¶ 266–276.) In addition to the use of Gilead's marks addressed in Part IV.A, Count II rests on a theory of false representation and false designation of origin. (*Id.* ¶¶ 271–272.) Count II incorporates only paragraphs 1 through 149. (*Id.* ¶ 266.) Gilead alleges in Count II that "Defendants' acts constitute a false representation and a false designation of origin" (*id.* ¶ 272), and that Defendants' "public statements induce participation in the scheme by providing false reassurance" that foreign-market Gilead medicine is the same as U.S. Gilead medicine (*id.* ¶ 271). However, the only statement Count II attributes to ScriptSourcing is that it offers "international sourcing" for "brand-name" medications. (*Id.* ¶ 269.) Gilead also alleges that Becker, in a June 2025 interview in a trade publication, "falsely stated that the FDA allows prescription medicine to be shipped to U.S. patients from foreign sources" and that "[t]here are no consequences for doing this. There's no fine or jail time." (*Id.* ¶ 183.)

15 U.S.C. § 1125(a)(1)(A) reaches two kinds of conduct. It reaches the use in commerce of "any word, term, name, symbol, or device" that "is likely to cause confusion," and it reaches the use of "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact" that is likely to cause confusion "as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(1)(A). Under 15 U.S.C. § 1125(a), a statement must be "either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1138 (4th Cir. 1993).

To the extent Count II rests on the use of Gilead's marks, Count II fails for the reasons set out in Part IV.A. To the extent Count II rests on a false or misleading representation of fact as to the origin of the medication, it fails for the additional reason that the FAC attributes no such representation to ScriptSourcing. As this Court has observed, "the instant action does not include a Lanham Act false advertising claim[.]" PI Op. at 50. Apart from the collective assertion in paragraph 271, Gilead does not allege that ScriptSourcing's statement is false or misleading, and an accurate statement that a program is international cannot be a false or misleading representation about foreign-market Gilead medicine. *See Mylan*, 7 F.3d at 1138. The only statement the FAC specifically characterizes as false that it attributes to either ScriptSourcing Defendant is Becker's June 2025 interview remark. (FAC ¶ 183.) That allegation does not support Count II. Count II incorporates only paragraphs 1 through 149 (*id.* ¶ 266), so paragraph 183 is not part of the claim. Even if it were, a statement about whether federal regulators permit or punish importation says nothing about the "origin, sponsorship, or approval" of Gilead's goods. 15 U.S.C. § 1125(a)(1)(A). Accordingly, Count II fails for the additional reason that the FAC does not allege that either ScriptSourcing Defendant made a false or misleading representation of fact.

### C. Count III fails because Maryland common-law unfair competition requires the same likelihood of confusion that the FAC does not adequately allege.

Count III asserts trademark infringement and unfair competition under "the common law of the State of Maryland and elsewhere" against all sixteen defendants, including the ScriptSourcing Defendants. (FAC ¶¶ 277–280.) Count III incorporates only paragraphs 1 through 149 (*id.* ¶ 277), and none of the allegations in the FAC's ScriptSourcing section (*id.* ¶¶ 173–186). Count III repeats, in substantially identical terms, the disjunctive conduct allegation and collective confusion allegation of Counts I and II (compare *id.* ¶¶ 278–279, with *id.* ¶¶ 257–258), and identifies no jurisdiction "elsewhere." (*Id.* ¶ 280.) Unfair-competition claims under Maryland

common law are governed by the same likelihood-of-confusion test that applies to unfair-competition claims under 15 U.S.C. § 1125(a). *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 597 (4th Cir. 1992). Under that test, the plaintiff must show that the defendant's use of the mark "is likely to confuse consumers." *Rosetta Stone*, 676 F.3d at 152.

As pleaded, Count III refers to the ScriptSourcing Defendants only in summary terms, and Count III fails as to the ScriptSourcing Defendants for that reason alone. *See SD3*, 801 F.3d at 422. Even reading Count III together with the FAC's ScriptSourcing-specific allegations, Count III fails because the FAC does not adequately allege that ScriptSourcing's disclosed program is likely to cause confusion (Part IV.A). *See Scotch Whisky*, 958 F.2d at 597. Either way, Count III fails as to the ScriptSourcing Defendants.

### D. Count IV fails because Gilead does not allege that it conferred a benefit on either ScriptSourcing Defendant or that the alleged enrichment is unjust.

Count IV asserts a claim for unjust enrichment against fourteen defendants, including both ScriptSourcing Defendants. (FAC ¶¶ 281–289.) Count IV incorporates only paragraphs 1 through 149. (*Id.* ¶ 281.) Gilead alleges that it would be inequitable to allow Defendants to keep "the unjust monetary benefits that they have knowingly reaped from their importation of international Gilead medication." (*Id.* ¶ 289.) Gilead alleges that Defendants used the Gilead Marks "in their unlawful scheme" and thereby "wrongfully derived a monetary benefit" (*id.* ¶¶ 282–283); that ScriptSourcing "receive[s] a payment for each international Gilead medication that [it] cause[s] to be imported" (*id.* ¶ 284); and that Becker "personally profited as a result of [his] compan[y's] profits" (*id.* ¶ 287).

Under Maryland law, a plaintiff claiming unjust enrichment must show (1) "[a] benefit conferred upon the defendant by the plaintiff[;]" (2) "[a]n appreciation or knowledge by the defendant of the benefit[;]" and (3) acceptance or retention of the benefit under circumstances that

make it inequitable to retain it without paying its value. *Hill v. Cross Country Settlement, LLC*, 402 Md. 281, 295 (2007). A benefit need not always "come necessarily and directly to the defendant from the plaintiff's own resources." *Id.* at 298. A benefit may reach the defendant through a third person, so long as the plaintiff is the "true owner" of what the defendant received: "[i]t is immaterial how the money may have come into the defendant's hands, and the fact that it was received from a third person will not affect his liability, if, in equity and good conscience, he is not entitled to hold it against the true owner." *Id.* (internal quotation marks and citation omitted).

Gilead does not allege that it conferred any benefit on either ScriptSourcing Defendant, directly or indirectly. The only sources of payment the FAC identifies, even counting paragraphs that Count IV does not incorporate, are the health plans that engage ScriptSourcing (FAC ¶ 177) and the administrators that process its invoices (*id.* ¶ 202). Becker's only alleged benefit is a share of ScriptSourcing's profits (*id.* ¶ 287). None of that money is alleged to be Gilead's or from Gilead, directly or indirectly. *See Hill*, 402 Md. at 295. Gilead's theory instead rests on Defendants' alleged use of the Gilead Marks. (FAC ¶¶ 282–283.) That theory is the infringement claim restated: the use of Gilead's marks makes an enrichment "unjust" only if the use infringes. Because the FAC does not adequately allege that ScriptSourcing's disclosed program infringes (Part IV.A), the FAC alleges nothing inequitable about ScriptSourcing's retention of fees that health plans paid for that program. Count IV therefore fails as to the ScriptSourcing Defendants.

**E. Count V fails because Gilead seeks relief under 15 U.S.C. § 1116 for an alleged violation of 15 U.S.C. § 1124, which provides no private right of action.**

Count V asserts a claim for importation of goods bearing infringing marks under 15 U.S.C. § 1124 against all sixteen defendants, including the ScriptSourcing Defendants, and seeks injunctive relief under 15 U.S.C. § 1116. (FAC ¶¶ 290–292.) Count V incorporates only paragraphs 1 through 149. (*Id.* ¶ 290.) Gilead pleads Count V on the theory that Defendants

imported foreign-market Gilead medicine "with the intent of inducing patients into believing that the products are authorized for distribution in the United States." (*Id.* ¶ 291.)

15 U.S.C. § 1124 provides that no imported article "which shall copy or simulate a trademark registered in accordance with the provisions of this chapter" — or that "shall bear a name or mark calculated to induce the public to believe that the article is manufactured in the United States" — shall "be admitted to entry at any customhouse of the United States." 15 U.S.C. § 1124. 15 U.S.C. § 1116(a) authorizes injunctions to prevent "the violation of any right of the registrant of a mark registered in the Patent and Trademark Office" or "a violation under subsection (a), (c), or (d) of section 1125 of this title[.]" 15 U.S.C. § 1116(a). Courts are divided on whether a trademark owner may enforce 15 U.S.C. § 1124 through 15 U.S.C. § 1116. Some courts have read 15 U.S.C. § 1116 to supply a private remedy for violations of 15 U.S.C. § 1124. *See, e.g.*, *Philip Morris USA, Inc. v. Lee*, 481 F. Supp. 2d 742, 748 (W.D. Tex. 2006).[4] Other courts hold that 15 U.S.C. § 1124 "is directed not to trademark owners, but to U.S. Customs officials." *See, e.g.*, *Nike, Inc. v. B&H Customs Servs., Inc.*, 565 F. Supp. 3d 498, 514 (S.D.N.Y. 2021). Under that view, 15 U.S.C. § 1124 "makes no reference to civil liability" and "does not create any 'right'" that 15 U.S.C. § 1116 could enforce. *Id.*

Count V fails because 15 U.S.C. § 1124 provides Gilead no private right of action. Gilead seeks relief on Count V only through an injunction "under 15 U.S.C. § 1116." (FAC ¶ 292.) 15 U.S.C. § 1116(a) reaches violations of "any right of the registrant" and violations of 15 U.S.C.

[4] *Philip Morris* relied in part on the First Circuit's decision in *Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, which decided a claim under 15 U.S.C. § 1124 on the merits without considering whether 15 U.S.C. § 1124 creates a private right of action. *See* 982 F.2d 633, 638–39 (1st Cir. 1992). Questions that "merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Webster v. Fall*, 266 U.S. 507, 511 (1925).

§ 1125(a), (c), and (d), but 15 U.S.C. § 1124 is not among the provisions that 15 U.S.C. § 1116(a) lists, and the only right 15 U.S.C. § 1124 gives a registrant is the right to record its mark "in order to aid the officers of the customs in enforcing this prohibition." *See* 15 U.S.C. § 1124; *Nike*, 565 F. Supp. 3d at 514; *see also Abbott Lab'ys v. Adelphia Supply USA*, No. 15-CV-5826 (CBA) (LB), 2024 WL 4250223, at *3 n.8 (E.D.N.Y. Aug. 22, 2024) (observing that 15 U.S.C. § 1116 "makes no mention of violations under § 1124"), *R&R adopted*, No. 15-CV-5826 (CBA) (LB), 2024 WL 4263935 (E.D.N.Y. Sept. 23, 2024). The reasoning of *Nike* tracks the text of both 15 U.S.C. § 1124 and 15 U.S.C. § 1116(a), and the Fourth Circuit did not reach Count V. *Meritain*, 187 F.4th at 149 n.2. Count V therefore fails as to the ScriptSourcing Defendants.

### F. Count VI fails because the FAC does not allege an underlying unlawful act.

Count VI asserts a claim for civil conspiracy against all sixteen defendants, including the ScriptSourcing Defendants. (FAC ¶¶ 293–297.) Count VI incorporates only paragraphs 1 through 149. (*Id.* ¶ 293.) Gilead alleges that "Defendants have agreed with each other to import, and/or to distribute and/or facilitate the distribution of, and/or to sell and/or facilitate the sale, and/or to pay for the importation" of foreign-market Gilead medicine (*id.* ¶ 294), and that such importation "violates federal law" (*id.* ¶ 296). Gilead alleges that Defendants' acts have caused it "actual damages in the form of lost sales." (*Id.* ¶ 297.)

A civil conspiracy is "a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Hoffman v. Stamper*, 385 Md. 1, 24 (2005) (internal quotation marks and citation omitted). The plaintiff "must also prove the commission of an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury," and conspiracy "is not a separate

tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.* at 24–25.

A civil conspiracy claim requires an underlying unlawful act. *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 340 Md. 176, 189-90 (1995) (internal quotation marks and citation omitted) ("No action in tort lies for conspiracy to do something unless the acts actually done, if done by one person, would constitute a tort."). The FAC does not sufficiently plead any underlying unlawful act. To the extent the object of the alleged conspiracy is infringement or unfair competition (Counts I through III), those counts fail as to the ScriptSourcing Defendants for the reasons set out in Parts IV.A through IV.C, and Count VI fails with them. *See Hoffman*, 385 Md. at 24–25. The FAC also alleges that importation itself "violates federal law," but does not identify that law. (FAC ¶ 296.) To the extent that law is the Food, Drug, and Cosmetic Act ("FDCA"), which the FAC elsewhere invokes to allege that importation is itself unlawful (*id.* ¶¶ 70, 73), this Court has already recognized in this case that "the FDCA does not provide a private right of action." PI Op. at 48. An alleged violation of a statute that Gilead cannot enforce cannot supply the unlawful act for Gilead's conspiracy claim. *See Blanchard v. Dorchester St. Jet Skis Inc.*, No. CV 25-1932-BAH, 2026 WL 2983199, at *4 (D. Md. Oct. 5, 2026) (dismissing Maryland civil conspiracy claim premised on a regulatory violation that provided no private right of action, because "[t]o give rise to civil conspiracy liability, a defendant's underlying unlawful conduct must provide a private right of action"); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 790 (3d Cir. 1999) ("A claim of civil conspiracy cannot rest solely upon the violation of a federal statute for which there is no corresponding private right of action."). To the extent the "federal law" in paragraph 296 is instead the Lanham Act, Count VI fails with Counts I through

III and Count V. (*See supra* Parts IV.A–IV.C, IV.E.) Count VI therefore fails as to the ScriptSourcing Defendants.

Count VI also fails because the FAC does not allege that either ScriptSourcing Defendant agreed with any other defendant to accomplish an unlawful act. A civil conspiracy requires an "agreement or understanding." *Hoffman*, 385 Md. at 24. Under the federal pleading standard, "a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556; *see also Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 611 (D. Md. 2014) (holding Maryland civil conspiracy inadequately pled where plaintiff alleged that defendants "conspired among themselves, by agreement and understanding," but provided "no details as to when such an agreement was reached or the contours of the agreement"). The FAC's allegation that "Defendants have agreed with each other" is pleaded against all sixteen defendants at once and is just such a bare assertion. (FAC ¶ 294.) Further, the only other defendant alleged to provide medicine through ScriptSourcing's program is Defendant CanaRx (*id.* ¶ 176), and CanaRx's role in that disclosed program is not infringement for the reasons set out in Part IV.A. The FAC's allegations about Defendant Meritain describe ordinary commercial dealings concerning ScriptSourcing's own program: Meritain processed ScriptSourcing's invoices and implemented ScriptSourcing's program for clients of Meritain's in-house pharmacy benefit manager. (*Id.* ¶¶ 67(b), 202, 216.) The FAC does not allege that either ScriptSourcing Defendant agreed with Meritain or anyone else to accomplish John Doe's undisclosed medication substitution, from which the prior rulings in this case arose. *See Twombly*, 550 U.S. at 557. Accordingly, Count VI fails as to the ScriptSourcing Defendants for this additional reason.

### G. Dismissal of Counts I through VI should be with prejudice because amendment would be futile.

Leave to amend may be denied where "the amendment would have been futile." *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc). The defect in Counts I through VI is not for a want of detail. Gilead's own specific admissions — that ScriptSourcing publicly advertises "international sourcing," advertises "international Gilead medicines to patients," and is paid by health plans "to obtain" foreign-market Gilead medicine; and that each member must "enroll" by "entering an agreement with CanaRx Group" (FAC ¶¶ 128(b), 175, 177, 269) —establish the informed purchase of international medication that defeats confusion. The *AbbVie* court described the same defect as the "underlying flaw" in that plaintiff's pleadings: "a failure to plausibly claim that Payer Matrix's program is likely to cause confusion among consumers." 2026 WL 1846752, at *27. That defect runs through every count. Without an adequately alleged likelihood of confusion, Gilead has no claim for infringement or unfair competition under Counts I through III (Parts IV.A–IV.C); no "unjust" enrichment under Count IV, which depends on infringement (Part IV.D); and no underlying unlawful act to support the conspiracy alleged in Count VI (Part IV.F). Count V fails for a reason no amendment can cure, because 15 U.S.C. § 1124 provides no private right of action (Part IV.E). Each of these defects goes to the substance of Gilead's claims and cannot be cured by repleading.

## V. CONCLUSION

For the foregoing reasons, the Court should dismiss the First Amended Complaint as against the ScriptSourcing Defendants with prejudice. Gilead's own allegations describe a program that tells its members before they enroll that their medicine will come from abroad. A member who knowingly chooses foreign-market Gilead medicine is not confused, and without an adequately alleged likelihood of confusion, Counts I through IV and Count VI fail as to the

ScriptSourcing Defendants. Count V fails because 15 U.S.C. § 1124 provides no private right of action. Count VI fails for the further reason that the FAC alleges no agreement by either ScriptSourcing Defendant to accomplish any unlawful act. Because these defects arise from Gilead's own allegations and from the governing law, not from a want of detail, amendment would be futile. In the alternative, if any count survives, the ScriptSourcing Defendants request that the Court require Gilead to replead with the specific allegations against each ScriptSourcing Defendant on which that count rests.

Respectfully submitted, this 13th day of November, 2026.

WILLIAMS MULLEN

/s/
Arnie B. Mason
Maryland Bar No. 21306
amason@williamsmullen.com
8350 Broad Street, Suite 1600
Tysons, VA 22102
(703) 760-5235

FELLOWS LABRIOLA LLP

/s/
Steven M. Kushner
(admitted *pro hac vice*)
Ethan M. Knott
(admitted *pro hac vice*)
Alisha Goel
(admitted *pro hac vice*)

Suite 2400 Harris Tower
233 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 586-9200
skushner@fellab.com
eknott@fellab.com
agoel@fellab.com

*Counsel for Defendants ScriptSourcing, LLC and Gary Becker*

**CERTIFICATE OF SERVICE**

Pursuant to Local Rule 102(1)(c), notice of electronic filing constitutes a certificate of service as to all parties to whom electronic notice is sent. I hereby certify that on November 13, 2026, I electronically filed the foregoing Memorandum of Law through the Court's CM/ECF system, which will send notice of the filing to all counsel of record.

/s/ *Arnie B. Mason*
Arnie B. Mason